**HEDGES ENTERPRISES, INC.**

v.

**CONTINENTAL GROUP, INC., et al.**

Civ. A. No. 78–1254.

United States District Court,
E. D. Pennsylvania.

Feb. 6, 1979.

Seymour Kurland, Harold E. Kohn, David Berger, Philadelphia, Pa., for plaintiff.

John Markle, Jr., Philadelphia, Pa., for Continental.

Edward C. German, Philadelphia, Pa., for American Bag.

Henry T. Reath, Philadelphia, Pa., for Chase.

Benjamin M. Quigg, Philadelphia, Pa., for Harley.

Ralph W. Brenner, Philadelphia, Pa., for St. Regis.

## MEMORANDUM

BECHTLE, District Judge.

Plaintiff Hedges Enterprises, Inc. ("Hedges"), brought this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively, to obtain injunctive relief and to recover treble damages and the cost of suit, including reasonable attorneys' fees, for the injuries allegedly sustained by Hedges, and the class it seeks to represent, resulting from the alleged violation by the defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1, *as amended.* The defendants named in Hedges' complaint are Continental Group, Inc. ("Continental"), American Bag & Paper Corporation ("American"), Chase Bag Company ("Chase") Harley Corporation ("Harley") and St. Regis Paper Company ("St. Regis"). The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1337. Presently before the Court is the plaintiff's motion for determination of this suit as a class action, pursuant to Fed.R.Civ.P. 23(a) and (b)(3). For the reasons stated below, plaintiff's motion for class action determination will be granted and we will certify, pursuant to Fed.R.Civ.P. 23(a) and (b)(3), the following class:

All individuals, proprietorships, partnerships, corporations and other business entities which have, during the period from January 1, 1950, to November 1, 1976, purchased consumer bags, also known in the trade as "small bags," directly from one or more of the defendants for use in their business in packaging their products and not for resale as "small bags."

In its complaint, Hedges alleges, *inter alia,* that:

Beginning at least as early as 1950, the exact date being unknown to the plaintiff, and continuing thereafter until at least November, 1976, the defendants . . . have engaged in a continuing combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act . . . The aforesaid combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants and co-conspirators of the substantial terms of which were to raise, fix, maintain and stabilize the prices and terms and conditions of sale of consumer bags.

Complaint, ¶¶ 12, 13. The complaint further alleges that the following effects occurred as a result of the conspiracy:

(a) Prices and terms and conditions of sale of consumer bags sold by the defendants and various co-conspirators have been raised, fixed, maintained and stabilized at artificial and noncompetitive levels;

(b) Buyers of consumer bags have been deprived of the benefits of free and open competition in the purchase of consumer bags; and

(c) Competition among the defendants and various co-conspirators in the sale of consumer bags has been restrained.

Complaint, ¶ 15. The term "consumer bag" is defined in the complaint as follows:

Consumer bags, also known in the trade as "small bags," are made from one or more plies of paper and may be combined with other materials used as linings and/or coatings. Consumer bags may have printed exterior designs as specified by the customer and are generally designed for capacities of less than twenty-five pounds. They are normally used to prepackage products which are then marketed in such bags.

Consumer bags are used for packaging a variety of products such as those sold by plaintiff herein and include, among other[s], pet foods, cookies, tea, coffee, kitty litter, chemicals and agricultural products.

Complaint ¶¶ 9, 10. In addition, Hedges alleges that, in the course of its business and during the period of time covered by its

complaint, it purchased consumer bags directly from one or more of the defendants for use by its wholly-owned subsidiary, Thornton-Minor McCleary Ointment Co., Inc. ("Thornton"), and has sustained injury as a result of the defendants' violations of the antitrust laws. Complaint, ¶ 3. Finally, Hedges alleges that it had no knowledge of the alleged antitrust violations, or of any facts which might have led to the discovery thereof, until November, 1976, and that it could not have discovered the violations at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by the defendants to avoid detection of and to fraudulently conceal such violations. Complaint, ¶ 16.

Hedges brings this action on behalf of itself and all others similarly situated and seeks to have the following class certified pursuant to Fed.R.Civ.P. 23(a) and (b)(3):

All individuals, proprietorships, partnerships, corporations and other business entities which have, during the period of time defined herein, purchased consumer bags, also known in the trade as "small bags," directly from one or more of the defendants for use in their businesses in packaging their products and not for resale as "small bags."

I. *Prerequisites to Maintaining Class Action*

To maintain this case as a class action, Hedges must satisfy the requirements of Fed.R.Civ.P. 23(a), which states:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*In re Plywood Anti-Trust Litigation,* 76 F.R.D. 570, 577 (E.D.La.1976). In addition to the requirements of Fed.R.Civ.P. 23(a), Hedges must also satisfy the Court that the action is properly maintainable under one of the three subdivisions of Rule 23(b). *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 577. In this case, Hedges seeks certification of a class pursuant to Fed.R. Civ.P. 23(b)(3), which states:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The plaintiff has the burden of establishing that each of the requirements of Rule 23(a) and Rule 23(b)(3) have been satisfied as to the proposed class. *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 577. In ruling upon a motion for class action certification, a court should not involve itself in an inquiry into the ultimate merits of the action. *Id.,* at 578. However:

"An analysis of the issues and the nature of proof which [would] be required at trial is directly relevant to a determination of whether the matters in dispute are principally individual in nature or are susceptible to proof equally applicable to all class members."

*Id.,* at 578 (citations omitted).

A. *Numerosity*

■ To satisfy the requirements of Rule 23(a)(1), Hedges must demonstrate to the Court that "the class is so numerous that

joinder of all members is impracticable." Hedges' allegations that the proposed class numbers in the thousands clearly satisfies this requirement, *Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 690 (E.D.Pa.1977); *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 578; *In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa. 1976), even though the exact number of class members is not known at the present time, *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 578.

### B. *Commonality*

■ The commonality requirement of Rule 23(a)(2) is satisfied if "there are questions of law or fact common to the class." It is not necessary, however, that each question of law or fact be common to every member of the class. *Axelrod v. Saks & Co.,* 77 F.R.D. 441, 444 (E.D.Pa.1978) (citation omitted). Furthermore, the requirements of Rule 23(a)(2) must be distinguished from the requirements of Rule 23(b)(3), and it is not necessary at this point of the determination that such common questions be shown to "predominate" over questions affecting only individual class members. *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 578. In the case before us, the defendants argue that Hedges' bare allegations of conspiracy are not sufficient to satisfy the requirements of Rule 23(a)(2). While many courts have stated that "Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy," *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 335, we would agree with the defendants that a bare allegation of conspiracy, without more, would probably not satisfy the requirements of Rule 23(a)(2). However, in light of our detailed discussion, *infra,* with respect to Hedges' satisfaction of the requirements of Rule 23(b)(3) and the fact that the existence, implementation and effect of the alleged conspiracy is the issue central to each proposed class member, we find, in the case before us, that there are clearly questions of law or fact common to the class, including, but not limited to, the proof which must be introduced by each of the plaintiffs in the proposed class that the defendants conspired to raise, fix, maintain and stabilize the prices and the terms and conditions of sale of consumer bags and that, therefore, Hedges has satisfied the requirements of Rule 23(a)(2).

### C. *Typicality*

■ Next, we find that Hedges has satisfied the requirements of Rule 23(a)(3), because its claims are typical of the claims of the class it seeks to represent in that they arose out of the same general course of conduct by the defendants and are based on the same or similar legal theories as those of the class. As with the requirement of Rule 23(a)(2), the representative plaintiff's claims do not have to be identical to those of other class members, although his claims must be similar enough to permit the Court to conclude that the representative party will adequately represent the interests of the class and that there are no antagonistic or adverse interests between the representative plaintiff and the proposed class. *Cohen v. Uniroyal, Inc., supra,* 77 F.R.D. at 691–692; *Kaufman v. Lawrence,* 76 F.R.D. 397, 399 (S.D.N.Y.1977); *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 579. The primary claim of Hedges and of the putative class is that they were injured in their trade or business by a conspiracy among the defendants to fix the price and the terms and conditions of sale of consumer bags and, therefore, Hedges' claims are typical of those of the members of the proposed class. *Cf. Axelrod v. Saks & Co., supra,* 77 F.R.D. at 444. As the court stated in *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 336, *quoting State of Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 567 (D.Minn.1968):

"Since the representative parties need prove a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical."

The defendants' argument that Hedges does not satisfy the requirements of Rule 23(a)(3) because Hedges, a relatively small company and a relatively small purchaser of consumer bags, seeks to represent a class consisting primarily of "Fortune 500" companies, who purchase great quantities of consumer bags, is meritless. While it is generally recognized that the typicality requirement of Rule 23(a)(3) and the adequacy requirement of Rule 23(a)(4) "represent a two-pronged approach intended to insure that the claims of the class members are fully presented and vigorously prosecuted" and that "the typicality requirement functions as a safeguard against inter-class conflicts and an assurance that the plaintiff's interests are more or less co-extensive with those of the class," *Sley v. Jamaica Water & Util., Inc.,* 77 F.R.D. 391, 394 (E.D.Pa. 1977) (citations omitted), it is also generally recognized that "the mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification . . . [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy," *id.,* at 394–395 (citations omitted). The litigative posture of Hedges before this Court, in the sense of claims and adversarial interests, is substantially identical to, sufficiently coextensive with and not atypical of the claims and adversarial interests of the putative class, and there is nothing in the record before us, including the fact of Hedges' size in comparison to the size of the companies which comprise the proposed class, which suggests any conflict or that the interests of the class would in any way be jeopardized. Furthermore, the defendants' argument that Hedges' claims are not typical of the claims of the class because Hedges is not a member of the class it purports to represent, because it is not a purchaser of "consumer bags," as that term was allegedly defined by the indictment and the Voluntary Bill of Particulars in the criminal case involving the defendants *sub judice, see* Criminal No. 76–514 ("criminal case"), is equally meritless and was discussed at length and disposed of by this Court's determination of the defendants' motion for summary judgment.

### D. *Representativeness*

■ The issue of whether Hedges is an adequate class representative within the meaning of Rule 23(a)(4) is more difficult. Adequate representation depends upon two factors: (1) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and, (2) the plaintiff must not have interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 336. In addition, the Court must find that the representative party and his attorney can be expected to prosecute the action vigorously. *In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 579. In the instant case, Hedges is represented jointly by three Philadelphia law firms: (1) Wolf, Block, Schorr and Solis-Cohen ("Wolf-Block"); (2) Berger & Montague, P.A. ("Berger"); and, (3) Kohn, Savett, Marion and Graf, P.C. ("Kohn-Savett"). There is no suggestion in the record that plaintiff's counsel are not competent, experienced counsel who are thoroughly familiar with class and antitrust litigation. Each of plaintiff's counsel has been involved in numerous antitrust actions and has been counsel for class representatives in many antitrust actions, both before this Court and before a multitude of courts across the Nation. The defendants argue, however, that the conduct of plaintiff's counsel in connection with this case, and with prior civil and criminal actions concerning the same defendants and the same circumstances as the case before us, precludes those counsel from serving as the class representative's counsel in the instant action. In support of this argument, the defendants state, in essence, the following basic facts: On October 29, 1976, a Federal Grand Jury sitting in the Eastern District of Pennsylvania returned a one-count indictment charging, *inter alia,* the five defendants *sub judice* with a conspiracy to raise, fix, maintain and stabilize the prices and the terms and conditions of

sale of consumer bags. On Monday, November 1, 1976, the first business day following the issuance of the indictment, Virginia Do-Nuts, Inc., and Virginia Do-Nuts of Maryland, Inc. (collectively, "Virginia Do-Nuts"), in Civil Action No. 76–3407, filed a class action complaint against the five defendants named in the criminal case. The Virginia Do-Nuts plaintiffs were jointly represented by Wolf-Block, Berger and Kohn-Savett. Those three law firms also jointly represented each of the other two plaintiffs, Thornton and Sambo's Restaurants, Inc. ("Sambo's"), who on November 19, 1976, and January 24, 1977, respectively, sought to participate as class representatives in the Virginia Do-Nuts proceeding. The Virginia Do-Nuts complaint, which basically tracked the language of the indictment, alleged that the plaintiffs and the class they sought to represent were, as direct purchasers of the defendants, injured in their trade or business by a conspiracy among the defendants to raise, fix, maintain and stabilize the prices and the terms and conditions of sale of consumer bags, in violation of Section 1 of the Sherman Act. Shortly after the filing of its original complaint, Virginia Do-Nuts filed an amended complaint which added Thornton as a named plaintiff. Virginia Do-Nuts then filed a motion to withdraw as class representative plaintiff, which motion was granted by this Court. Ultimately, the defendants' motions for summary judgment against the plaintiffs in the Virginia Do-Nuts case and in other related civil cases (collectively, "civil cases") were granted, on the grounds that the named plaintiffs in those actions were either not direct purchasers of consumer bags or that the bags they purchased were not "consumer bags," and the cases were dismissed. Hedges then filed the present action.

With respect to the first requirement of Rule 23(a)(4), the defendants argue that the conduct of all counsel in connection with the Virginia Do-Nuts case and the filing of the present complaint by Hedges subsequent to our grant of summary judgment in favor of the defendants in the civil cases render all counsel unable to serve as counsel to the class. In addition, the defendants argue that particular conduct of each of the law firms which represent Hedges renders each individual firm unable to serve as class counsel. With respect to the second element noted above, the defendants argue that Hedges has interests antagonistic to those of the class, because Hedges is not a typical purchaser of consumer bags. Both the defendants and the plaintiffs submitted affidavits to the Court to support or to refute the defendants' allegations concerning the conduct of Hedges' counsel. To resolve the conflicts inherent in these affidavits, this Court held a hearing on October 16, 1978. After careful consideration of the testimony received at that hearing and of the memoranda and affidavits submitted to the Court on the issue of adequate representation, we hold that Hedges has satisfied the requirements of Rule 23(a)(4). More specifically, we hold that the alleged conduct on the part of Hedges' counsel does not render them unable to represent the class but, because of the appearance of impropriety on the part of Wolf-Block, that firm may represent Hedges individually but may neither represent Hedges in its capacity as class representative nor serve as counsel for the class Hedges represents. In addition, we hold that Hedges does not have interests antagonistic to those of the class and that it has demonstrated that it can be expected to vigorously prosecute this action.

In general, the defendants allege that the appearance of impropriety on the part of Hedges' counsel with respect to the substitution of Thornton as the class representative in the Virginia Do-Nuts case and the subsequent filing of a complaint by Hedges, a class representative with an allegedly small stake in the outcome of this case and one whose costs and expenses in pursuit of this action are allegedly being advanced by counsel, renders those counsel unable to represent the class representative, because that conduct creates the impression that Hedges' counsel are, or might be, more interested in recovering large attorneys' fees than in advancing Hedges' purportedly small interests. We find the defendants'

allegations to be unsupported by the record. The affidavit of David Pesin ("Pesin"), Secretary-Treasurer and principal owner of Virginia Do-Nuts, submitted by Hedges in response to the defendants' allegations, establishes that Virginia Do-Nuts' decision to withdraw as class plaintiff was the result of threatened retaliation by Continental against Virginia Do-Nuts for the latter filing suit. Pesin Affidavit, ¶¶ 5–8, 11. Even without the Pesin affidavit, we would find the defendants' allegations to be unsupported. There is nothing in the record to support the defendants' accusation that the substitution of the class representative in Virginia Do-Nuts was other than a good faith substitution made after the deficiencies inherent in Virginia Do-Nuts' representation became apparent. Furthermore, the record contains no support for the defendants' allegations of impropriety on the part of Hedges' counsel for their decision to file suit on behalf of Hedges after summary judgment was granted against, *inter alia,* Thornton on the ground that Thornton was not a direct purchaser of consumer bags, particularly where Thornton is Hedges' wholly-owned subsidiary and Hedges had actually purchased the consumer bags used by Thornton.

With specific reference to Kohn-Savett, the defendants allege that the Kohn firm cannot adequately represent the class because, prior to the filing of the Virginia Do-Nuts complaint, Kohn-Savett represented the Bancroft Bag Company ("Bancroft"), a manufacturer of consumer bags whose documents were subpoenaed by the Grand Jury which issued the indictment in the criminal case and, as counsel for Bancroft, Kohn-Savett met with counsel for other consumer bag manufacturers whose documents were subpoenaed by the Grand Jury. The defendants argue that, through its representation of Bancroft, Kohn-Savett may have gained information from Bancroft or defense counsel which could be used in this action against the defendants and that, therefore, Kohn-Savett cannot now represent Hedges or the class. In support of this allegation, the defendants have submitted the affidavits of Larry L. Williams ("Williams") counsel for Continental, and Grant S. Lewis ("Lewis"), counsel for St. Regis, which state, *inter alia,* that they had attended a meeting on June 1, 1976, of all counsel whose clients had received subpoenas *duces tecum* from the Philadelphia Grand Jury and that Michael D. Hausfeld ("Hausfeld"), of the Washington, D.C., office of Kohn-Savett, had attended the meeting on behalf of Bancroft. Williams' affidavit states, in pertinent part:

> Discussion at this meeting concerned the status of the Grand Jury investigation. Meeting participants exchanged information regarding the nature of the evidence, both in oral testimony and in documentary submission, believed to have been presented to the Grand Jury and discussed possible enforcement actions which might result from the pending investigation. Mr. Hausfeld personally engaged me in conversation concerning these particular matters.

Williams Affidavit, ¶ 4. In response, Hedges submitted the affidavit of Hausfeld which states, in essence, that during the brief period in which he was in attendance at the June 1, 1976, meeting, there was no substantive discussion whatsoever with regard to the Grand Jury investigation and that the only conversation he had with Williams at that meeting concerned his request to Williams for the citation to a judicial opinion involving Continental to which reference had been made at the meeting.

To resolve the conflicts between the Williams, Lewis and Hausfeld evidence, this Court heard testimony on this issue at the October 16, 1978, hearing. At the hearing, Hausfeld testified and reaffirmed the statements contained in his affidavit to the effect that he had obtained no substantive information at the July 1, 1976, meeting and that his only contact with Williams was Hausfeld's request to Williams for the citation to a judicial decision involving Continental which had been mentioned at the meeting. *See* Transcript of Hearing on Adequacy of Plaintiffs' Counsel to Represent Class ("Transcript"), pp. 35–39. Williams then testified, in pertinent part, as follows:

Q. (By the Court): Now, I want to ask you about that last sentence. All right?

Now, firstly, when did he personally engage you in conversation about those matters? . . .

\*   \*   \*   \*   \*   \*

A. In the room, the same room. It was at that time that I noticed Mr. Hausfeld for the first time. He came up to me and asked me about if I would give him the citation of the case involving Continental. I told him I didn't know the citation.

Q. I see.

And was that the extent of his inquiry to you or discussion, essentially?

A. Correct.

Q. Is that what you mean when you say, "Mr. Hausfeld personally engaged me in conversation concerning these particular matters"?

A. Well, I assumed it was a little broader than that.

Q. Well, what do you remember was said other than the reference to the citation of the case?

Was there anything else said?

A. Not by Mr. Hausfeld.

Q. I see. All right.

So that sentence at the end of Paragraph 4—I will read it again—"Mr. Hausfeld personally engaged me in conversation concerning these particular matters" —that refers to his inquiry to you in regard to that citation?

A. That citation, and I assumed, without knowing, he was referring to the Rose Loughray case versus Continental.

Q. A case, though?

A. That's right.

Q. A court case?

A. But it had—as you know, Your Honor, Rose Loughray's lawsuit had considerable bearing on this litigation.

Q. No, but, I mean, that sentence has no bearing on the general—you tell me if I am right or wrong in this, understanding what you are saying—that last sentence about Mr. Hausfeld's engagement in conversation with you doesn't relate to a conversation he had with you at that

meeting with regard to the nature of the evidence before the grand jury, oral testimony, documentary submissions, enforcement actions, does it?

A. No, it does not.

Q. All right.

*See* Transcript, pp. 41–43.

The testimony of both Hausfeld and Williams reveals that Hausfeld, although present at the June 1, 1976, meeting of defense counsel, learned nothing of substance concerning the criminal case or anything relating to the case before us. Furthermore, the testimony of both Hausfeld and Williams reveals that the only conversation between Hausfeld and Williams "concerning these particular matters" related solely to Hausfeld's request to Williams for the citation to a public judicial opinion involving Continental. While in the future, to avoid the appearance of impropriety, it might be better for counsel who represent a witness before a Grand Jury and who attend strategy sessions of defense counsel to decline to represent civil plaintiffs who later file complaints against the clients of those same defense counsel, on the record before us, we find the defendants' allegations concerning the possibility that Kohn-Savett might have obtained information from these contacts that could be used against the defendants in the present action to be unfounded. Furthermore, the Court notes that the Williams affidavit submitted by the defendants in support of their allegations concerning the alleged misconduct of Kohn-Savett, which they argued rendered Kohn-Savett incompetent to represent the putative class, was insubstantial and affirmatively misleading; and it was not until the Court questioned the witnesses and heard testimony at the October 16, 1978, hearing that it became clear that the last sentence of paragraph 4 of the Williams affidavit referred to entirely different "matters" than did the remainder of that paragraph.

Third, with respect to the Berger firm, defendants have submitted the affidavit of Wayne R. Carlberg ("Carlberg"), District Sales Manager of Continental's Flexible

Packaging Division, which, as summarized by the defendants, states in pertinent part:

In conversations with executives of Virginia Do-Nuts, Mr. Carlberg was told that the Berger firm had been after Virginia Do-Nuts to file suit for two years, that the authorization to file suit was obtained during a telephone call at 11:00 p. m. on Saturday night (the day after the Indictment was returned), and that the authorization was given after Virginia-Donuts [sic] was told that the suit must be filed immediately because "the statute of limitations was about to expire" and that Virginia Do-Nuts would not be the only firm to file suit because others, including Food Fair, were already filing suit (Carlberg Aff.).

See Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed May 2, 1977, in Civil Action No. 76–3407, and made a part of the record herein by Stipulation, p. 33, n. 35 ("first opposition memorandum"). In response, Hedges has submitted the affidavit of Pesin which states, in essence, that Pesin was a long-time friend and client of David Berger of the Berger firm; that on October 30, 1976, at approximately 9:30 p. m., he had received a call at his home from a member of the Berger firm who advised him that an indictment had been returned against certain manufacturers of consumer bags; and that, as a result of that phone call, he authorized Berger to file suit against the bag manufacturers on behalf of Virginia Do-Nuts. Pesin Affidavit, ¶¶ 1, 2, 4, 9. The Pesin affidavit further asserted that the telephone call from the Berger firm was in response to his request that the Berger firm keep him informed of all antitrust developments relevant to Virginia Do-Nuts. Id., at ¶¶ 4, 9. Finally, the Pesin affidavit stated that Virginia Do-Nuts withdrew as the class plaintiff because, through a person named John McManus, Pesin was informed that Carlberg of Continental had said that Continental would no longer sell consumer bags to Virginia Do-Nuts as long as the latter's suit was pending. Id., at ¶¶ 5, 8, 11.

We find that the testimony elicited by the Court at the October 16, 1978, hearing with respect to Berger's contacts with Virginia Do-Nuts prior to the filing of the class action complaint by Virginia Do-Nuts supports the statements contained in the Pesin affidavit as well as in the affidavit of Stanley R. Wolfe, submitted by Hedges in opposition to the defendants' allegations, and that the conduct of the Berger firm with regard to the filing of the Virginia Do-Nuts complaint was at all times proper, professional and ethical. See Transcript, pp. 15–25, 55–58. In making this determination, we place particular emphasis upon the uncontroverted Pesin affidavit wherein Mr. Pesin, an officer and substantial owner of Virginia Do-Nuts, affirmatively stated that the Berger firm had contacted him at his request, that he had "fully and voluntarily" authorized Berger to file suit on his behalf and that he had withdrawn as class plaintiff solely because of his fear of retaliation from Continental.

Finally, the defendants allege that Wolf-Block's association with Donald Hedges, a one-seventh owner of Hedges and a partner in Wolf-Block at the time of the filing of the Virginia Do-Nuts complaint, who is presently of counsel to the Wolf-Block firm, renders that firm's representation of the class in this case inappropriate under the standards established by the Third Circuit in Kramer v. Scientific Control Corp., 534 F.2d 1085, 1093 (3d Cir.), cert. denied sub nom., Arthur Andersen & Co. v. Kramer, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976), because "the attorney's fees to be paid to plaintiff's attorneys (Wolf-Block and Donald Hedges) will be generated by a common fund which would otherwise be for the benefit of the class (Hedges and Donald Hedges)." See Defendants' First Opposition Memorandum, p. 35. In response, the plaintiff has submitted the affidavit of Seymour Kurland ("Kurland"), a partner in Wolf-Block, to the effect that: (1) Hedges was a client of Wolf-Block before the instant action was filed; (2) Hedges filed its complaint after Donald Hedges ceased to be a partner in Wolf-Block; and, (3) effective January 31, 1978, Donald Hedges ceased to be a partner in Wolf-Block and became of

counsel to the firm. *See* Kurland Affidavit, ¶¶ 1–4. In addition, at the October 16, 1978, hearing, the following facts were stated for the record by Kurland: (1) Donald Hedges' name appears on Wolf-Block's stationery as counsel to the firm; (2) Donald Hedges no longer has offices at Wolf-Block, nor any day-to-day contact with the firm; and, (3) Donald Hedges no longer has a voice in the policy decisions of Wolf-Block. *See* Transcript, pp. 9–13. However, Kurland also stated at that hearing that Donald Hedges has an agreement with Wolf-Block that he is to receive payments for a period of years, with the amount of the payments to be determined, at least in part, by the amount of money received by Wolf-Block from the representation of clients, such as Hedges, who were clients of Donald Hedges while he was a partner in the firm. *Id.*, at 12–13.

In *Kramer v. Scientific Control Corp.,* *supra,* 534 F.2d at 1086, the Third Circuit specifically addressed the issue of whether a "member of the bar who is a plaintiff class representative in a class action proceeding under Rule 23(b)(3) of the Federal Rules of Civil Procedure [may] designate as his counsel a member or employee of his law firm," and answered the question in the negative on the ground that such a relationship created at least the appearance of an improper conflict of interest. *Id.*, at 1092. The rule enunciated by *Kramer* to govern such situations is:

> [N]o member of the bar either maintaining an employment relationship, including a partnership or professional corporation, or sharing office or suite space with an attorney class representative during the preparation or pendency of a Rule 23(b)(3) class action may serve as counsel to the class if the action might result in the creation of a fund from which an attorneys' fee award would be appropriate.

*Id.*, at 1093. The situation before us is clearly distinguishable from that presented in *Kramer* in that the class representative in the present action is not an attorney who maintains an employment relationship with class counsel but, rather, is a corporation which bears the name of, and is owned in part by, an attorney who maintains an employment relationship with class counsel. But despite this distinction, we find that the case before us is clearly within the holding and spirit of *Kramer,* for not only might this action "result in the creation of a fund from which an attorneys' fee award [might] be appropriate," but the attorney who maintains an employment relationship with class counsel and who is a part owner in and namesake of the class representative would benefit from the creation of that fund, thus creating at least the appearance of impropriety. More specifically, Donald Hedges stands to benefit from this suit in two ways. First, as a shareholder of the class representative, Donald Hedges would presumably benefit from any damages received by Hedges as a result of this action. Second, because the amount of the payments received by Donald Hedges from Wolf-Block are partially dependent upon the amount of money Wolf-Block receives from former clients of Donald Hedges, and because Hedges was a former client of Donald Hedges, any attorney's fees received by Wolf-Block as a result of this action would presumably also inure to the benefit of Donald Hedges. Accordingly, although the relationship presently before us is distinguishable from that presented in *Kramer,* we hold that, because such relationship creates the appearance of impropriety, Wolf-Block may not serve as counsel to Hedges in its capacity as class representative or to the class, although it may continue to represent Hedges on an individual basis. We emphasize that our holding is not in any way intended to reflect adversely upon Wolf-Block. The Wolf-Block attorneys connected with this case have at all times conducted themselves in a vigorous, competent and professional manner and have vigorously and adequately pursued Hedges' interests as well as those of the class. However, because of the appearance of impropriety created by the situation before us, and to protect the interests of the class members, we must preclude Wolf-Block from serving as counsel to the class or to Hedges in its representative capacity.

Finally, with respect to the second element of Rule 23(a)(4), the defendants argue that Hedges is not a proper class representative because Hedges is a small user of consumer bags and a small company and is, therefore, not a representative or typical purchaser from the standpoint of its interactions with the defendants. In support of this allegation, the defendants, citing the deposition of Robert B. Hedges, argue, *inter alia*, that Robert B. Hedges' lack of knowledge of the industry is so great that Hedges' personnel can be of no assistance to their counsel in the prosecution of this action. We have dealt with the defendants' allegations concerning Hedges being a small purchaser of consumer bags in our discussion concerning the typicality requirement of Rule 23(a)(3). In addition, we find that the record does not support the defendants' allegations concerning Hedges' employees' lack of knowledge of this lawsuit. Accordingly, on the basis of the record before us, we hold that Hedges does not have interests antagonistic to those of the class and that it can be expected to vigorously prosecute this action.

## II. *Rule 23(b)(3) Requirements*

We turn, finally, to the issue of whether Hedges has satisfied the requirements of Fed.R.Civ.P. 23(b)(3). As the Third Circuit stated in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978):

> Before certifying a class under Rule 23(b)(3), the district court must determine that the four prerequisites contained in 23(a) are satisfied, "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Before making its finding on predominance, the court must, of course, identify the issues involved in the lawsuit and which are common, and before making its finding on the superiority of the class action device, it must apply the fairness and efficiency criteria contained in the rule.

*Id.*, at 448. Whether these dual requirements have been satisfied is a crucial issue and, therefore, an in-depth discussion of the various positions of the parties and of the applicable law is required. *In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 342. To establish a claim pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, the plaintiff must demonstrate: (1) the existence of a conspiracy among the defendants in violation of Section 1 of the Sherman Act; (2) direct injury to the plaintiff's business or property proximately resulting from such violation; and, (3) the actual damages sustained by the plaintiff. *Zenith Radio Corp. v. Hazeltine*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), *rev'd on other grounds*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Windham v. American Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). In addition, if they are to extend their claims beyond the four-year statute of limitations of the Clayton Act, 15 U.S.C. § 15b, the plaintiffs must demonstrate that the statute of limitations is tolled by the fraudulent concealment of the defendants. The burden is upon Hedges to establish which, if any, of these issues is common to the members of the class, whether those common questions predominate over questions affecting only individual members and whether class treatment of these issues is superior to other available methods for the fair and efficient adjudication of this litigation.

The first element of Rule 23(b)(3) requires a finding that common questions of law and fact predominate over questions affecting only individual members. That common questions of law and fact exist is demonstrated where either the applicable principles of law or the proof necessary to establish an element of the particular claim are the same for each member of the class. However, Rule 23 requires more than a consideration of commonality in the ultimate questions of law and fact; it also requires close consideration of the separate questions of law or fact which determine

the ultimate issues. *In re Transit Co. Tire Antitrust Litigation*, 67 F.R.D. 59, 73–74 (W.D.Mo.1975). This close consideration of the questions of law and fact which determine the ultimate issues must demonstrate that those common questions of law and fact predominate over questions affecting only individual questions. However, the plaintiff is only required to demonstrate predominance, not exclusivity, of common questions, *Cohen v. Uniroyal, Inc., supra*, 77 F.R.D. at 695; *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed*, 574 F.2d 656 (2 Cir. 1978), for class certification does not require that common questions be completely dispositive of the entire litigation as it pertains to each individual member of the class, *In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 344.

### A. *Existence of a Conspiracy*

To establish the first element of their claim, the existence of a conspiracy among the defendants in violation of Section 1 of the Sherman Act, the plaintiffs in the case before us must demonstrate: (1) that the defendants conspired to raise, fix, maintain and stabilize the prices and the terms and conditions of sale of consumer bags; (2) that prices were fixed pursuant thereto; and, (3) that the plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been. *In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 345; *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 457 (E.D.Pa.1968). In support of its argument that the existence of a conspiracy among the defendants in violation of Section 1 of the Sherman Act is an issue common to the class, Hedges, citing a long string of cases, states that a great number of courts which have considered the issue have held that, where price-fixing conspiracies are charged, the questions of law or fact common to the class predominate over the questions, usually those relating to damages, which affect only individual members. In opposition, the defendants argue that the issue of conspiracy is not common to Hedges and the members of the class because Hedges' pleadings allege various conspiracies relating to different types of consumer bags. Specifically, the defendants argue that: (1) Hedges is bound by the definition of "consumer bag" as that term was used in the criminal case; (2) Hedges purchased a heat-sealed stock bag which is not a "consumer bag" within the criminal case's definition; and, (3) Harley does not manufacture heat-sealed bags.

While we disagree with both Hedges' and the defendants' arguments, we find, on the basis of the pleadings and the record before us, that the conspiracy issue is one common to the members of the class. First, we decline to adopt Hedges' theory that, when a price-fixing conspiracy is alleged, a presumption arises that class certification is proper. *See Shelter Realty Corp. v. Allied Maintenance Corp., supra*, 75 F.R.D. at 37. Second, this Court, in its Memorandum and Order denying the defendants' motions for summary judgment filed January 8, 1979, discussed at length and dismissed as meritless the defendants' arguments that Hedges is bound by the definition of "consumer bag" contained in the criminal case or that the bag purchased by Hedges is different from the bags purchased by other members of the class. *See In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 733–734 (N.D.Ill.1977). Moreover, we note that the mere fact that Harley did not personally manufacture the type of bag purchased by Hedges is irrelevant to Harley's liability with respect to Hedges' allegations of a conspiracy for:

> [t]he fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all—for each co-conspirator contributed to the charging of the supra-competitive price paid by the purchaser.

*Bogosian v. Gulf Oil Corp., supra*, 561 F.2d at 448; *see also In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 348. Turning to the issue of a conspiracy, we note that the central claim of Hedges' complaint, made on behalf of itself and the class that it seeks to represent, is that the defendants conspired to raise, fix, maintain

and stabilize the terms and conditions of sale of consumer bags. On the basis of the record presently before us, we find that the proof necessary to demonstrate the existence, implementation and effect of this alleged conspiracy would require a "common thread of evidence" which would "correspond to evidence which otherwise would be introduced by absentee class members," *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 345 (citations omitted), and that this issue is, therefore, common to all members of the class. *See also Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 36–37; *In re Folding Carton Antitrust Litigation, supra,* 75 F.R.D. at 733–734.

B. *Fact of Damage*

■ As the Third Circuit stated in *Bogosian v. Gulf Oil Corp., supra,* if the plaintiffs prove a violation of the antitrust laws, they must still prove that they have suffered the "fact of damage" as a consequence of that violation. *Id.,* at 454. Proof of the fact of damage involves two elements, the second of which contains two subparts. The first element requires the plaintiff to demonstrate that his injury is "not too indirect, remote or incidental a consequence of [the] violation." *Id.* The second element requires the plaintiff to demonstrate that he has suffered some loss in his business or property and that there is a causal connection between the violation and the loss. *Id.* As the Third Circuit noted in *Bogosian* :

Fact of damage in this sense is purely factual and does not involve questions of policy in its routine application. It advances no policy apart from the simple concept of causation—that plaintiff has suffered loss as a consequence of the violation . . . .

Since, as we have indicated, the second aspect of fact of damage is a simple concept of causation, any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case. There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suf-

fered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

*Id.* The court went on to state that:

If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[T]he burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of *some* damage flowing from the unlawful conspiracy . . . ." *Zenith Radio, supra,* 395 U.S. at 114, 89 S.Ct. at 1571 n. 9. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. *See In*

*re Antibiotic Antitrust Actions, supra* [D.C.] 333 F.Supp. [278] at 281.

*Id.,* at 455 (emphasis supplied).

In arguing that the circumstances of this case require proof of the fact of damage on a highly individualized basis, the defendants would have us restrict the standards and examples cited in *Bogosian* by the test enunciated by the Fourth Circuit in *Windham v. American Brands, Inc., supra,* that:

> in cases where the fact of injury and damage breaks down in what may be characterized as "virtually a mechanical task", "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability.

*Id.,* at 68 (footnotes omitted). The defendants then argue that proof of the fact of damage in the case *sub judice* would not be a "mechanical task," because Hedges' adoption of the definition of "consumer bag" in the criminal cases amounts to an admission on the part of Hedges that the manufacture of a consumer bag involves an unknown multiple of possible combinations for the makeup of a consumer bag which requires that the price and the terms and conditions of sale for each consumer bag must be individually negotiated. Thus, they argue that proof of the fact of damage will require lengthy, individualized proof with respect to the negotiations concerning each plaintiff's purchase of each consumer bag. We disagree.

In its complaint and in its reply brief, Hedges alleges that the defendants were the major producers of consumer bags and that they conspired to produce or maintain a generally inflated price structure, which price structure then became the "benchmark" for all sales negotiations. The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the

fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary. *See, e. g., Bogosian v. Gulf Oil Corp., supra,* 561 F.2d at 455. Even if the alleged conspiracy were shown to extend to the individual negotiations, the proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly, on the basis of the facts and record before us, we find that the issue of the fact of damage is predominantly, if not entirely, a common question. *See Bogosian v. Gulf Oil Corp., supra,* 561 F.2d at 455; *see also In re Plywood Anti-Trust Litigation, supra,* 76 F.R.D. at 583–584; *Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 37; *In re Folding Carton Antitrust Litigation, supra,* 75 F.R.D. at 733–744; *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 346–348. *Windham v. American Brands, Inc., supra,* cited so strenuously by the defendants, is clearly distinguishable on its facts from the case before us. In *Windham,* the structure of the tobacco market created such inherent diversity and required such highly individualized, non-uniform negotiations with respect to each unique sale that proof of impact could not even be commenced by a demonstration of common proof. In the case *sub judice,* as in those cases noted in support of our conclusion, the market is not so inherently diverse nor are individual negotiations so entirely unique that at least some common basis of proof of the fact of damage could not be found.

## C. *Actual Damages*

■ The defendants argue that the actual damages suffered by each plaintiff are highly individual questions of law and fact and that, even if this Court determines that the issues of conspiracy and fact of damage are common to the class, the issue of actual damages is so substantial and will require such a high quantum of individual proof that it alone predominates over all other common issues of law and fact, thus precluding class treatment.

In *Bogosian v. Gulf Oil Corp., supra,* the court noted that, while the actual damages

suffered by each plaintiff must of necessity be determined on an individual basis, the necessity for the determination of that issue on an individual basis should not preclude class determination when the common issues which determine liability predominate. *Id.*, at 456; *see also Shelter Realty Corp. v. Allied Maintenance Corp., supra*, 75 F.R.D. at 37–38; *In re Folding Carton Antitrust Litigation, supra*, 75 F.R.D. at 734–735; *In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 350–355. In the case before us, Hedges' allegations that the defendants conspired to produce or maintain a generally inflated price structure which became a "benchmark" for all sales negotiations would be the common starting point from which all plaintiffs would prove their actual damages. The actual damages incurred by each plaintiff would then, of course, require individualized proof. However, all of the parties to this action are businesses which presumably kept records of all of their transactions respecting consumer bags and, thus, proof of individual damages would be well documented. The mathematical calculations of the differences between the price that would have been but for the alleged conspiracy, the "benchmark" price and the negotiated price might be sufficient to establish each plaintiff's actual damages. If more proof were required, the resulting number of mini-trials do not appear to require such complex or lengthy proof as to establish, at this time, that the individual damage issues predominate in this case. Moreover, at the proper time, it might be possible to work out a formula solution to the issue of actual damages or to bifurcate the proceedings. We need not finally determine this issue at the present time. Accordingly, we find, on the basis of the record before us, that the issue of damages involves both common and individual questions of law and fact and that, at this time, the common questions appear to predominate over individual questions.

## D. *Fraudulent Concealment*

■ Finally, in order to toll the four-year statute of limitations of the Clayton Act, 15 U.S.C. § 15b, and to be entitled to establish claims which extend beyond October 29, 1972, Hedges and the members of the proposed class must demonstrate that the defendants fraudulently concealed their unlawful activities and that each plaintiff did not discover the facts which support his claim despite the exercise of due diligence on his part. The defendants argue that these issues are highly personal, susceptible only of individualized proof and, therefore, inappropriate for class treatment because common questions of law and fact would not then predominate. In reply, Hedges argues that the bulk of proof for any plaintiff with respect to the issue of fraudulent concealment—the fact of concealment— would be common to every plaintiff and that the individual issues of due diligence and success of concealment would require such a small quantum of proof that the common proof would predominate with respect to this issue. We agree with Hedges that at least the issue of the fact of concealment would be susceptible to common proof, and we note that the issue of the success of concealment might also be a common question. *See, e. g., In re Plywood Anti-Trust Litigation, supra*, 76 F.R.D. at 586; *In re Sugar Industry Antitrust Litigation, supra*, 73 F.R.D. at 343, 348. Accordingly, as with the issue of actual damages, while the issue of fraudulent concealment appears to involve both common and individual questions, at the present time it appears that the common questions involved in this issue would predominate.

In conclusion, we find that the issues of conspiracy and fact of damage are common to the class and that, while the issues of damages and fraudulent concealment contain both common and individual questions, the common issues predominate with respect to those issues. On balance, therefore, those questions of law and fact which are common to the members of the class predominate over those affecting only individual members and, thus, the first element of Rule 23(b)(3) is satisfied.

## E. *Superiority of Class Action Treatment*

■ Finally, Rule 23(b)(3) requires Hedges to demonstrate "that a class action

is superior to other available methods for the fair and efficient adjudication of the controversy." The defendants argue that class treatment is not superior to other available methods of adjudication because: (1) the majority of the putative class members are Fortune 500 companies who are fully capable of representing themselves in individual actions; (2) class treatment would not serve the interests of judicial economy, because the multitude of individual issues in this case would require extensive mini-trials; (3) a single jury would be unable to absorb, remember or carefully consider the vast and complex issues presented by this case; and, (4) class treatment would defeat the fairness criteria of Rule 23, because the complexity and number of issues in this case preclude the possibility of the defendants receiving a fair trial. In reply, Hedges argues in particular that, far from being comprised of Fortune 500 companies, the putative class members have numerous small claims which are not of sufficient size to justify individual actions and that class treatment in a case such as this is particularly important.

We find, on the basis of the following, that class treatment of the instant case would be the fairest and most efficient method of adjudicating this controversy and that a class action is superior to other available methods of adjudication. First, the two possible alternative methods of adjudication which come to mind—the test-case approach and intervention—would be inferior. The class is alleged to number in the thousands and the members are alleged to be small claimants. *See, e. g., In re Folding Carton Antitrust Litigation, supra,* 75 F.R.D. at 733. Individual actions would be unnecessarily duplicitous, expensive and time-consuming, particularly in light of the predominance of common questions. *Id.* Second, the names and addresses of the putative class members are alleged to be easily ascertainable from the parties' business records and, thus, the mechanics of notifying the class do not appear to present manageability problems. *See, e. g., Bogosian v. Gulf Oil Corp., supra,* 561 F.2d at 456. Third, although individual questions will require the introduction of individual proof which may become lengthy or complex, we do not at this time interpret that fact as necessarily rendering this class action unmanageable. *See, e. g., Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 38–39. Furthermore, the predominance of common questions inherent in this action would be beneficial to the defendants in that only once need they defend against Hedges' allegations of their liability under the Clayton Act and, if successful, need not fear individual actions with respect to the same issues *ad infinitum.* In conclusion, after consideration of all the arguments presented by the parties, the record and the potential areas of unmanageability, we are convinced at this time that class treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

An appropriate Order will be entered.