**FISHER BROTHERS, Goldberg Plumbing Supply Company, Inc., WEDJ Incorporated, Sherby and Sherby, Inc., t/a Cobbs Supply Co., Kamen Supply Co., Inc., Standard Plumbing Supply Co., Inc., Elbo Industrial Supply Co., Gunhill Plumbing Supply, Inc., Big D Building Supply Company, Amity Plumbing & Heating Supply Corp., J. Heller & Sons, Inc., Cernuto, Inc., Pipeline Supply, Inc., Mineola Plumbing Supply Company, Inc., W.H. Conyngham Co., Inc., Conyngham & Company, Inc., Luzerne & Lackawanna Supply Co., Wilco Plumbing & Heating Supply Co., Inc., John B. Davie Co., Inc., Interco Systems, Inc., Plaintiffs,**

v.

**MUELLER BRASS COMPANY, Defendant.**

**Civ. A. No. 84-0413.**

United States District Court, E.D. Pennsylvania.

July 6, 1984.

---

Seymour Kurland, Burt M. Rublin, Wolf, Block, Schorr & Solis-Cohen, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for plaintiffs.

Barry W. Levine, Dickstein, Shapiro & Morin, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

Plaintiffs, on behalf of themselves and a putative class, allege that defendant, a manufacturer and distributor of copper water tubing, conspired with others in the copper tubing industry to fix prices in violation of the Sherman Act, 15 U.S.C. § 1. Jurisdiction is based on 28 U.S.C. § 1337. Plaintiffs' pending motion to certify a class pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure will be granted.

## FACTUAL BACKGROUND

Plaintiffs filed this action on January 20, 1984; they allege that from "as early as 1975 and continuing thereafter at least until November 1982 ... the defendant and its co-conspirators engaged in a continuing combination and conspiracy ... to raise, fix, maintain and stabilize the prices and terms and conditions of sale of copper water tubing...." Complaint, ¶¶ 14, 15. Plaintiffs also allege that:

Prior to November 1982, plaintiffs had no knowledge of the aforesaid antitrust violations, or of any facts which might have led to discovery thereof. Plaintiffs could not have discovered the violation at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendant and its co-conspirators to avoid detection of, and fraudulently conceal, such violations.

Complaint, ¶ 20. Plaintiffs claim that defendant conspired with individuals and entities including certain manufacturers and sellers of copper water tubing, Cambridge-Lee Industries, Inc. ("CLI"), Cerro Copper Products, Inc. ("Cerro"), Halstead Industries, Inc. ("Halstead"), Howell Metal Company, Inc. ("Howell"), Phelps Dodge Industries, Inc. ("PDI"), Reading Industries, Inc. ("Reading"), Revere Copper and Brass, Inc. ("RCB"), and Revere Copper Products, Inc. ("RCP"). Complaint, ¶ 7. Plaintiffs allege that "[d]efendant and its co-conspirators account for a substantial portion of all copper water tubing sales in the United States." Complaint, ¶ 9.

Plaintiffs propose to represent a class defined as:

all individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendant, its subsidiaries and affiliates, and its co-conspirators) who have, during the period of time covered by this Complaint, purchased copper water tubing directly from the defendant (including defendant's subsidiaries and affiliates) or its co-conspirators. The term 'copper water tubing' means, for purposes of this provision, 'copper water tubing' as commonly used and understood in the industry. 'Copper water tubing' does not include copper tubing manufactured to customer specification, which is sold primarily to original equipment manufacturers and is known in the industry as 'industrial tubing'.

Complaint, ¶ 8(a). Plaintiffs define the period the time covered as "[b]eginning at least as early as 1975 and continuing thereafter at least until November, 1982, the exact dates being unknown to plaintiffs ...." Complaint, ¶ 14.

This is one of twenty-four actions filed between November, 1982 and January, 1984 against some or all of these copper water tubing manufacturers and sellers that allege a price-fixing conspiracy in this industry. The claims against CLI, Cerro, Halstead and Howell have been consolidated under *Fisher Brothers v. Cambridge-Lee Industries, Inc., et al.*, No. 82–4921 (E.D.Pa. filed November 5, 1982) (the "Master File" case) (*see,* Pretrial Order No. 30, March 16, 1984, Master File case); the claims against PDI have been consolidated under *Fisher Brothers v. Phelps Dodge Industries, Inc.,* No. 83–2457 (E.D.Pa. filed May 23, 1983). The individual defendants named in some of these actions have been dismissed by stipulation (Pretrial Order No. 26) and the claims against three defendants, Reading, RCB and RCP, have been severed and stayed because of bankruptcy proceedings (Pretrial Orders No. 27 and 18(b)).

Six of the defendants in these cases, CLI, Cerro, PDI, Reading, RCB and RCP, and five individual defendants who have been dismissed by consent were indicted and tried for violating the Sherman Act, 15 U.S.C. § 1. *United States v. Cambridge-Lee Industries, Inc., et al.,* Criminal No. 83–00107 (E.D.Pa. filed March 18, 1983).[1]

---

1. Mueller Brass Company was named as an unindicted co-conspirator (see page 4 of Plaintiff's Reply Brief).

Following nine-week trial, all those defendants were acquitted in December, 1983. Discovery, other than with regard to third parties, was stayed while the criminal proceedings were pending.

On April 26, 1983, counsel for plaintiffs and defendants CLI, Cerro, Halstead and Howell stipulated to a class in the Master File case identical to that here proposed; the court approved and certified the stipulated class consisting of:

all individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their subsidiaries and affiliates, and their co-conspirators) who have, during the time period 1975 through November, 1982, purchased copper water tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their co-conspirators.

Stipulation, ¶ 2. The parties stipulated that:

Copper water tubing means "copper water tubing" as commonly used and understood in the industry. "Copper water tubing" does not include copper tubing manufactured to customer specification, which is sold primarily to original equipment manufacturers and is known in the trade as "industrial tubing".

Stipulation, ¶ 3. These four defendants did not object to including "red brass" pipe in the definition of copper water tubing. *See,* Pretrial Order No. 30.[2] Neither plaintiffs nor defendants waived their rights to move pursuant to Fed.R.Civ.P. 23(c) to alter or amend the class determination before a decision on the merits. Stipulation, ¶ 6.

### DISCUSSION

■ Plaintiffs seek to certify a class with twenty (20) named representatives of the class. Without further explanation of their need to assure adequate representation or a suggestion of subclasses, the court considers more than two representatives excessive. In a March 16, 1984 telephone conference in this matter, plaintiffs suggested that Fisher Brothers, Inc. and Goldberg Plumbing Supply Company, Inc. could be the named class representatives; this discussion is based on certification of those two plaintiffs as representatives of the class, subject to later modification if the need should appear.

■ Plaintiffs have the burden of establishing that all the requirements of Rule 23(a) and (b)(3) have been satisfied; *In re Fine Paper Antitrust Litigation,* 82 F.R.D. 143 (E.D.Pa.1979), *appeal dismissed,* 617 F.2d 22 (3d Cir.1980).

Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

■ (1) *Numerosity.* Plaintiffs seek to certify a nationwide class of all persons, whatever their form of business organization, who purchased copper water tubing directly from the defendant or its alleged co-conspirators during the time period from 1975 through November, 1982. Plaintiffs aver that the number of such purchasers is in the thousands (Plaintiffs' Memorandum in Support of Class Action Motion, Exhibit A at 7) and defendant does not contest this estimate by plaintiffs. Joinder of such a great number would be impractical so plaintiffs have met this requirement of 23(a)(1).

■ (2) *Commonality.* There are questions of law and fact common to the members of the class. "Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about

---

**2.** This is consistent with the class definition in the proposed Agreement of Settlement with PDI in Civil Action No. 83–2457.

the existence, scope and effect of the alleged conspiracy." *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 335 (E.D.Pa.1976). Questions common to the class are: (a) the existence of a conspiracy and defendant's participation in it; (b) the impact (*i.e.*, fact of damage) of the conspiracy on the class; and (c) whether and until when defendant fraudulently concealed its activities. The commonality requirement of Rule 23(a)(2) is satisfied.

■ (3) *Typicality.* Defendant argues that plaintiffs' definition of copper water tubing in the proposed class definition is so broad that certification must be denied. Defendant's Memorandum at 37–41. Defendant's argument is that the definition of "copper water tubing" in the class definition is so broad it renders the identification of class members too imprecise and destroys the typicality of the named representatives.

The court is unpersuaded. The definition of the class is sufficient to identify clearly who is and is not in the class. Anyone who bought copper water tubing, not industrial tubing, from defendant or one of its alleged co-conspirators during the relevant time period is a member of the class. The definition of "copper water tubing" as " 'copper water tubing' as commonly used and understood in the industry" but not "copper tubing manufactured to customer specification," Complaint, ¶ 8(a), is understandable and sufficiently precise at this time. Defendant is correct that this includes many categories of tubing. However, it is alleged that all these categories of tubing appear on price lists allegedly fixed by the conspirators. If a type of tubing which is commonly understood in the industry as "copper water tubing" is not included on those lists and not otherwise part of the conspiracy, the class definition may be modified. All four defendants [3] in the Master File case stipulated to the same definition and have not sought to modify it. The court is satisfied that the

class definition clearly identifies the class members.

Defendant contends that an expansive definition of tubing will so increase the membership in the class that the claims become untypical of those of the named representatives. For example, defendant argues that Mueller is the only copper tubing manufacturer producing nitrogen charged ACR tube on a standard basis (Affidavit of Vincent Bower attached to Defendant's Memorandum in Opposition to Motion for Class Certification, ¶ 6). Mueller contends it is likely that none of the named plaintiffs has ever purchased nitrogen charged ACR tube from Mueller. While this is not a fact of record, defendant states that only six of the named plaintiffs ever bought any copper water tubing from Mueller at all. To defendant, this suggests that plaintiffs' claims as to this type of tubing, and perhaps other types as well, are not only non-typical but non-existent as to Mueller. This problem, compounded if the action were consolidated for trial with the Master File cases, is said to preclude class certification altogether.

■ The representative claims need only be typical, not identical, to the claims of the class. The representative's claims "only need be sufficiently similar to allow the court to conclude that (1) the representative will protect the interests of the class, and (2) there are no antagonistic interests between the representative and the proposed class." *In Re Glassine & Greaseproof Paper Antitrust Litigation*, 88 F.R.D. 302, 304 (E.D.Pa.1980), (citations omitted). Any "atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy." *Sley v. Jamaica Water and Utilities, Inc.*, 77 F.R.D. 391, 395 (E.D.Pa. 1977).

Named plaintiffs have some interest in proving a conspiracy involving all types of tubing whether or not named plaintiffs bought all types themselves. The greater

---

**3.** Two of the four have now agreed to settle but the class definition was stipulated prior to settlement; the court gives less weight to the fact that one other settling defendant agreed to substantially the same class definition in connection with the settlement agreement.

the volume of sales affected by the alleged conspiracy, the greater the recovery. However, someone who bought a particular type of tubing would have a greater interest in that type and would protect the interests of those who purchased that type of tubing more vigorously. The court may require substitution or addition of a class representative if those presently named have not purchased any one of the types of tubing at issue or, in the alternative, the court may modify the class definition to exclude such tubing.

■ Otherwise, plaintiffs' claims here are typical of the class they propose to represent. The class plaintiffs seek to have certified consists of direct purchasers of copper water tubing from defendant or its co-conspirators. The complaint alleges a common course of conduct by defendant and co-conspirators to fix the price of tubing sold to all direct purchasers. Anyone who did not purchase from defendant or one of its co-conspirators during the period of the conspiracy is not a member of the class. Those in the class would all have to prove the existence and affect of this alleged conspiracy in order to prevail. Whether one class member bought twice as much tubing from defendant than another member, or different types of tubing than another member, goes to the calculation of damages, not the proof of the existence of the conspiracy. Class certification is always provisional in that it is subject to modification; whether or not the action will be bifurcated and tried just on liability pursuant to Fed.R.Civ.P. 16 will be determined at the final pretrial conference. At present, plaintiffs satisfy the requirements of Rule 23(a)(3) as to typicality.

■ (4) *Adequacy of Representation.* Of the four requirements of Rule 23(a), none is more important that the representatives "fairly and adequately protect the interests of the class." Rule 23(a)(4). Class members are bound by a settlement or a judgment on the merits of a class action even though they do not choose the forum or the counsel and may even be unaware of the litigation. *See Hansberry v. Lee,* 311 U.S. 32, 43, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940) (class members bound by judgment where they are adequately represented by named parties, or where they participate in the litigation, or "where for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter"); *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *Bolden v. Pennsylvania State Police,* 578 F.2d 912 (3d Cir.1978); *Brown v. United States,* 508 F.2d 618, 627 n. 10 (3d Cir. 1974); *Giordano v. Radio Corp. of America,* 183 F.2d 558 (3d Cir.1950); Restatement, Second, Judgments § 41 (1982).

■ Adequacy of representation is constitutionally required to afford due process. *Hansberry, supra.* Therefore, the court must be satisfied that the proposed class representatives "and their attorneys will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

■ The first inquiry concerns the proposed class representatives and their attorneys. The focus is usually on the adequacy of counsel but the adequacy of the proposed class representatives should also be considered. The court has had an opportunity to view the adequacy of one of the proposed class representatives, Fisher Brothers, Inc., in the prosecution of the Master File and Phelps Dodge cases. The court has no reason to doubt that the class

representatives proposed, Fisher Brothers, Inc. and Goldberg Plumbing Supply Company, Inc., will "competently, responsibly and vigorously prosecute the suit."

Plaintiffs' lead counsel, Seymour Kurland, Esquire and Leonard Barrack, Esquire, are skilled and experienced attorneys in the antitrust field and have been counsel in many other nationwide class actions. *See, e.g., Hedges Enterprises, Inc. v. Continental Group Inc.,* 81 F.R.D. 461 (E.D. Pa.1979); *Axelrod v. Saks & Co.,* 77 F.R.D. 441 (E.D.Pa.1978). The court has had the opportunity to observe the performance of lead counsel in the representation of plaintiffs in the Master File and Phelps Dodge cases. The court finds the first aspect of the inquiry under 23(a)(4) satisfied.

The second aspect of the inquiry focuses on the relationship of the proposed class representatives' interests compared to the interests of the class. At this point there appears to be no antagonistic interest between the representatives and the class and their "goals in the conduct of the suit," *Wetzel, supra* at 247, appear consistent. Should an issue arise concerning the purchases of the representatives, *supra,* the court may modify the class or allow a new representative. The court finds the requirements of typicality satisfied.

Plaintiffs, having satisfied the requirements of 23(a), must also demonstrate that the requirements of 23(b) have been met. Plaintiffs seek certification of a class action under Rule 23(b)(3). They must show that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.*

1. *Common Questions.* In order to prevail on the merits, plaintiffs have to prove the existence of a conspiracy affecting the price of the copper water tubing in which defendant participated, and that plaintiffs sustained damages caused by the conspiracy. *Glassine, supra* at 306. Defendant does not argue that individual questions predominate over common questions regarding proof of the existence of a conspiracy or defendant's participation. Defendant contends that the unique nature of its pricing system precludes class-wide proof of impact, or injury in fact, and proof of damages. Defendant contends that "an in-depth inquiry into each purchase will be required," so that approximately seven million individual questions will have to be addressed at trial and that these individual questions predominate. Defendant's Memorandum in Opposition to Class Certification at 26, 28 n. 7.

Defendant argues that its pricing system is individualized for each transaction, that the actual price for any order is the result of various discounts applied to a standard "price sheet" price, and that the amount of discount "varies on a day to day (sometimes hour to hour) basis, depending on numerous factors including, but not limited to, changes in the basic cost [of raw materials], meeting a competitor's price, and how much Mueller wants a particular order." Defendant's Memorandum at 13. It is contended that, "every Mueller purchaser will have to prove that he suffered injury in fact with respect to each purchase." Defendant's Memorandum at 23.

Similar arguments have been made and rejected in other horizontal price-fixing cases. *Glassine, supra; Hedges, supra; In re Screws Antitrust Litigation,* 91 F.R.D. 47 (D.Mass.1981); *In re Plywood Anti-trust Litigation,* 76 F.R.D. 570 (E.D. La.1976); *In re Sugar, supra.*

The Third Circuit explained in *Bogosian, supra* at 454–55, that:

Since [impact] ... is a simple concept of causation, any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case.... Thus, when an antitrust violation impacts upon a class of persons ... there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact

of damage can be proven on a common basis therefore depends upon the circumstances of each case.

. . . .

If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by proof of *some* damage flowing from the unlawful conspiracy. . . ." *Zenith Radio v. Hazeltine Research, supra,* 395 U.S. [100] at 114, 89 S.Ct. [1562] at 1571 n. 9 [23 L.Ed.2d 129 (1969)]. Under these circumstances, proof on a common basis would be appropriate.

Plaintiffs here allege a nationwide conspiracy to elevate prices in the industry by raising and fixing the price sheets from which discounts were calculated. If so, there could be an impact in each sales transaction in which one of those price sheets was used in determining any individual price, even if only as the base from which discounts were taken. Plaintiffs' Memorandum in Reply at 25. Plaintiffs state they will prove that this defendant negotiated discounts from such price sheets. Defendant's explanation of its pricing system does not contradict this. *See* Defendant's Memorandum at 14. Thus, if there is adequate proof of a conspiracy to fix price sheet price levels higher than they would have been absent that conspiracy, there may be common proof of impact on all members of the class, if the base price from which individual discounts were negotiated were higher. *Glassine, supra* at 306. If the base prices are inflated by a conspiratorial agreement to keep them at a level higher than they would have been without the conspiracy, all purchasers are affected by the price artificially maintained even if the discounts from those base prices vary from purchaser to purchaser and from day to day, depending on a number of other factors. *Hedges, supra* at 475 ("Proof of a conspiracy to establish a 'base' price [from which all price negotiations began] would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary."). So long as the conspiratorial conduct affects the price sheets commonly used as a starting point, it affects the price ultimately charged to a greater or lesser degree and the fact of impact, if not the amount, is capable of proof on a class basis.

Likewise, no matter how individualized determination of damages may be, such issues need not predominate when the common liability issues remain undetermined; "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Bogosian, supra* at 456. Plaintiffs assert that a common formula for individual damages' calculation can be established so that the amount of damages is also a common question. But that need not be decided in order to rule on class certification at this time.

It remains to be later determined whether or not the trial should be bifurcated as to liability; the court reserves for later consideration issues under Fed.R.Civ.P. 23(d) and 42. The court may order consolidation for trial of common questions of law or fact in the related cases; the court may also order separate trial of any separate issue or claim. The court also reserves the

right to alter or amend the certified class by decertification as to individualized issues or the creation of subclasses as may be desirable from time to time before a final decision on the merits.

Defendant also contends the proof of fraudulent concealment involves individual questions. Plaintiffs seek a class beginning in 1975; this action was filed January 24, 1984. In order to toll the four-year statute of limitations imposed by the Clayton Act, 15 U.S.C. § 15b, plaintiffs "must show that [defendant] fraudulently concealed [its] unlawful actions, and that plaintiffs were unable, despite the exercise of due diligence, to discover the facts which support their claims." *Glassine, supra* at 307. Thus, the inquiry at trial will focus on both defendant's actions and plaintiffs' actions. However, as in *In re Fine Paper, supra* at 154:

> The key question on the issue of fraudulent concealment will relate to whether defendants successfully concealed the existence of the alleged conspiracy, and the proof of this contention will necessarily be common among the class members.

*See, e.g., Glassine, supra* at 307; *In re Sugar, supra* at 348; *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 248 (S.D.Tex.1978); *In re Plywood, supra* at 586.

Plaintiffs will have to show that they had no knowledge of the alleged conspiracy prior to January 24, 1980, four years prior to the filing of this complaint. Plaintiffs allege that:

> Prior to November 1982, plaintiffs had no knowledge of the aforesaid antitrust violations, or of any facts which might have led to discovery thereof. Plaintiffs could not have discovered the violation at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendant and its co-conspirators to avoid detection of, and fraudulently conceal, such violations.

Complaint, ¶ 20. Proof of whether defendant concealed the alleged conspiracy and for what period of time are questions common to the class. Any plaintiff who knew or reasonably should have known of the conspiracy prior to January 24, 1980 will be barred from recovery. But at present in the absence of evidence of any particular event prior to November, 1982 that might have put some but not all class members on notice, common questions as to the alleged concealment of the conspiracy by defendant and its co-conspirators predominate over inquiries as to the knowledge of various members of the class. The court finds that common questions regarding fraudulent concealment predominate.

The questions, then, that are common to the class are: (1) the existence of a conspiracy and defendant's participation; (2) the impact of the conspiracy; and (3) whether and until when defendant fraudulently concealed its activities. Individual questions may be: (1) the actual amount of damages any individual class members may have suffered and (2) whether plaintiffs exercised due diligence. The court finds that common questions predominate.

■ 2. *Superiority of Class Action.* A class action is the superior method for litigating this action because of the number of possible claimants and the predominance of the common questions presented. Defendant's concern for unmanageability allegedly arising out of a preponderance of individual questions is unwarranted because the common class questions predominate at this time. Individual trials to prove liability issues common to the class not only would be costly to many class members but also a waste of judicial resources. Therefore, this matter seems particularly well-suited to class litigation.

Plaintiffs suggest that defendants in the Master File action stipulated to the certification of a class identical to the one sought here because in cases of this nature it is so clear that class certification is appropriate. Defendant argues that those defendants stipulated to a class definition to gain certain advantages in preparing for the related criminal trial. But two of the four defendants stipulating to the class were not defendants in the criminal case; these

defendants are represented by experienced, competent counsel from law firms with established reputations in antitrust cases, and none have opposed class certification. Moreover, the stipulation expressly provided that no party waived its right to move to amend or modify the class. Stipulation, ¶ 6. To date no defendant in the Master File case has so moved. Instead, the parties have agreed to a proposed notice of the pendency of the litigation to be sent to the members of the class.

The class certified in the Master File case was a stipulated class but it was not a class for settlement purposes only so that defense counsel were not tempted to expand the class definition solely to preclude subsequent claims. The class was certified for settlement purposes only in the separate action against Phelps Dodge, which was coordinated for pretrial purposes but not consolidated. Prior to giving the tentative approval preliminary to notice to the class of the proposed settlement required by Rule 23(e), the court has had occasion to consider the evidence that could be introduced at the trial of that case and the related class actions. Because of differences regarding the definition of the types of copper tubing, the purchase of which is the subject of this litigation, the court has had occasion to consider facts the plaintiff class may be able to establish at trial at pretrial hearings where counsel for defendant Mueller Brass Company was present and had the opportunity to be heard. Therefore, the court has more familiarity with the issues to be litigated than is common at this preliminary stage. In addition, the court has reviewed certain portions of the transcript of the criminal trial of defendant's alleged co-conspirators. This together with careful consideration of the briefs of counsel and the case authority in this Circuit convinces the court that class certification with notice to the class at this time is practicable and consistent with the interests to be advanced by the Federal Rules of Civil Procedure, including Rule 23, for "the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1.

Plaintiffs have met their burden in demonstrating that the requirements of Rules 23(a) and 23(b)(3) have been met. The court will certify a class defined as follows:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendant, its subsidiaries and affiliates, and its co-conspirators) who have, during the time period January 1, 1975 to November 30, 1982, purchased copper water tubing directly from the defendant (including defendant's subsidiaries and affiliates) or its co-conspirators. The term "copper water tubing" means, for purposes of this provision, "copper water tubing" as commonly used and understood in the industry. "Copper water tubing" does not include copper tubing manufactured to customer specification, which is sold primarily to original equipment manufacturers and is known in the industry as "industrial tubing."

The accompanying Order requires counsel to submit forthwith a proposed form of notice to the class.